IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| STEVEN ROSEMBERT, | : | CIVIL ACTION |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | No. 13-2826 |
| | : | |
| BOROUGH OF EAST LANSDOWNE, | : | |
| <u>et</u> <u>al.</u>, | : | |
| | : | |
| **Defendants.** | : | |

_____ :

**Goldberg, J.**                                                          **January 14, 2016**

### <u>MEMORANDUM OPINION</u>

   This case revolves around the 2011 arrest of Plaintiff, Steven Rosembert, and his subsequent allegations of excessive force by law enforcement officers from several neighboring boroughs in Delaware County, Pennsylvania. Plaintiff has sued Defendants: the Borough of Yeadon and Yeadon Police Officer, Shawn Burns; the Borough of East Lansdowne and East Lansdowne Police Officers, Paul McGrenera and Jesse Hartnett; and the Borough of Lansdowne and Lansdowne Police Officers, Tina Selimis and Lawrence Albertoli.

   The three Defendant Boroughs, and their respective officers, have filed separate motions for summary judgment seeking dismissal of the following claims: (1) excessive force against all Defendants pursuant to 42 U.S.C. § 1983 ("Count I"); (2) claims against the Defendant Boroughs for failure to train, supervise, and discipline the boroughs' respective police officers brought under <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658 (1978) ("Count III"); (3) assault and battery against Officers McGrenera and Burns ("Count V"); and (4)

intentional infliction of emotional distress against all Defendants ("Count VII"). [1]   For the reasons that follow, Defendants' motions for summary judgment will be granted in part and denied in part.

## I.  FACTUAL AND PROCEDURAL HISTORY[2]

On the evening of May 24, 2011, Plaintiff traveled to his friend Steve Lucien's parents' home in East Lansdowne, where his motorcycle was being repaired. (Pl.'s Dep. 80:11–21.) Plaintiff did not drive himself to the Lucien home because his license was suspended due to a prior arrest for driving under the influence. Id. at 55–56; 72:1–2. Before leaving his house, Plaintiff, who felt ill at the time, consumed roughly a glass and-a-half of an alcoholic home remedy that his mother prepared for him. Id. at 65:8–11; 66:21–22.

Sometime later at the Lucien home, Plaintiff decided to test his repaired motorcycle. While operating the motorcycle on Lewis Avenue, Plaintiff made a U-turn. As he made the U-turn, Plaintiff saw a police car, which gave pursuit. Plaintiff failed to stop, and a chase ensued. Id. at 73:4–19. With the police in pursuit, Plaintiff drove his motorcycle back to the Lucien residence, and entered the home through a side door. He proceeded down a hallway to a bedroom located in the rear section of the first floor, and hid in a small closet inside the bedroom.  Id. at pp. 85:12–14; 89:3–4; 90:18–22.

From this point forward, the parties' accounts of the events are vastly different.  Plaintiff avers that he was pursued by police into the Lucien residence and was discovered hiding in the bedroom closet, where he immediately put his hands in the air and did not attempt to escape or

---

[1] I previously dismissed the following claims: A general Monell claim against the Borough Defendants ("Count II"), denial of due process pursuant to § 1983 against the Defendant Officers ("Count IV"), malicious prosecution against all Defendants ("Count VI"), fraud against Defendant McGrenera ("Count VIII"), retaliation against all Defendants ("Count IX"), and conspiracy under the color of state law pursuant to §§ 1983, 1985 and 1986 against all Defendants ("Count X").

[2] The following facts are undisputed unless otherwise noted.

resist arrest. Id. at 94:5–18. Despite his compliance, Plaintiff claims that one officer tased him, and another officer struck him in the neck with a metal object. Id. at 92:15–17; 93:11. Plaintiff asserts that he was able to read the name tag of Officer Paul McGrenera before he fell to the floor, where he was "kicked and booted and beaten" for several minutes by a group of police officers inside the bedroom. Id. at 93:18. Plaintiff claims there were at least five white police officers in the room while he was kicked and beaten on the floor, one of whom was female. Id. at 97:10–11, 20. Plaintiff next explains that he was picked up by several unidentified officers and forced to walk out of the bedroom at a pace faster than he was capable of walking due to the lingering muscular effects of the taser. Id. at 109:6–10.

After being placed in handcuffs and removed from the house, Plaintiff states that he was tased at least two more times as he was placed into a police patrol car. Id. at 112:5–12. Witnesses Steven Lucien, Guy Mystil, and Jean Rosembert, all testified at deposition that while Plaintiff was in handcuffs, he was tased, struck with a retractable metal baton, and punched in the ribs while being escorted to the police car. (See Lucien Dep. 38:14–15; Mystil Dep. 36:1–3; 38:13–15; J. Rosembert Dep. 58:5–17.) Notably, Mystil testified that after Plaintiff yelled that his handcuffs were too tight, he was tased two more times while seated in the back of the patrol car. (Mystil Dep. 35:23–24; 36:1–3.) Lucien also testified that during the alleged beatings outside of the residence, he did not hear any officers give a command to stop tasing Plaintiff. (Lucien Dep. 65:20–23.)

Defendants contend that apart from Officer McGrenera, Plaintiff is unable to identify any officers that hit him at any point during his arrest. (See Defs.' Yeadon and Burns Br., pp. 6–10.) Defendant McGrenera testified at his deposition that he did not recall the presence of any other police officers besides himself and Officer Burns inside the house during Plaintiff's arrest.

3

(McGrenera Dep. 24:13–14.) Officer Burns admitted that he deployed his taser on Plaintiff in the bedroom, but stated he did so after Plaintiff raised his hands in an "aggressive posture" in the moments before Burns engaged the taser. (See Defs.' E. Lansdowne, McGrenera, & Hartnett Br., p. 2; Burns Dep. 20:12–13.) Officer McGrenera testified that Plaintiff was tased by Officer Burns because he was resisting arrest by attempting to kick and punch the officers. (McGrenera Dep. 24:17–18.) Although Officer McGrenera admitted to carrying a retractable metal "asp" or "baton," he denied using it on Plaintiff at any point during the arrest. Id. at 20:17–22.

Plaintiff was subsequently charged with numerous offenses, including driving under the influence, aggravated assault, resisting arrest, and a litany of traffic related offenses. (Defs.' McGrenera & Hartnett Br., Ex. O.) Ultimately, Plaintiff accepted a plea agreement wherein he pled guilty to driving under the influence and fleeing or attempting to elude police. All additional charges against him were dismissed. (See Defs. McGrenera & Hartnett's Mot. to Dismiss, Doc. No. 29, Ex. B–D.)

Plaintiff filed his complaint on May 22, 2013, raising claims for excessive force and municipal liability under 42 U.S.C. § 1983, as well as state law claims for assault and battery, and intentional infliction of emotional distress.  Defendants have moved for summary judgment on all claims.

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v.

4

County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.  After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.  LEGAL ANALYSIS

### A.  Count I: Excessive Force (All Defendants)

A plaintiff may bring a civil action under 42 U.S.C. § 1983 against an official who violates his constitutional rights.  Section 1983 provides in relevant part:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or territory . . . causes to

> be subjected, any citizen of the United States . . . to the deprivation
> of any rights, privileges or immunities secured by the Constitution
> . . . shall be liable to the party injured in an action at law . . . .

Section 1983 excessive force claims against police officers are "analyzed under the Fourth Amendment and its reasonableness standard." Mellott v. Heemer, 161 F.3d 117, 121 (3d Cir. 1998) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)); see also United States v. Johnstone, 107 F.3d 200, 204 (3d Cir. 1997).

This standard considers whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting [the officer], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. This determination is based upon the totality of the circumstances, including: "(1) whether the suspect posed an immediate threat to the safety of the officer or others; (2) whether the suspect was actively resisting arrest; and (3) the severity of the crime at issue." Suber v. Peterson, WL 1875542, at *3 (E.D. Pa. Aug. 4, 2005) (citing Graham, 490 U.S. at 396). "In considering whether a seizure was reasonable, the Court must judge from the perspective of a reasonable officer on the scene, rather than with the perfect vision of hindsight." Id.

### 1. Officers McGrenera & Burns

Defendants McGrenera and Burns acknowledge that they pursued and arrested Plaintiff on May 24, 2011. However, they assert that summary judgment is appropriate because there is insufficient information in the record to demonstrate that excessive force was used. They further argue that Plaintiff has not properly identified any officer that used force against him, as is required to establish liability under § 1983.

In order for Plaintiff's excessive force claim against the Defendant officers to survive summary judgment, he must generally identify the specific officer(s) that engaged in the

excessive use of force against him. See, e.g., McNeil v. City of Easton, 694 F. Supp. 2d 375, 395 (E.D. Pa. 2010) (citing Sharrar v. Felsing, 128 F.3d 810, 821 (3d Cir. 1997); Munson v. City of Philadelphia, WL 2152280, at *3 (E.D. Pa. July 15, 2009).

Examined in the light most favorable to Plaintiff, the evidence of record clearly identifies Officer McGrenera as one of the actors responsible for the alleged excessive force. Plaintiff testified that he was struck on his neck with "a metal stick" in the bedroom immediately after he fell to his knees in reaction to an initial taser shock. (Pl.'s Dep. 100:21.)[3] At his deposition, Plaintiff identified McGrenera as one of the officers that hit him inside the bedroom. Id. at 103:11. Plaintiff testified that he was able to read McGrenera's name tag just after he was struck with a metal object in the bedroom, and again when he was picked up and carried from the bedroom by the officers on scene. Id. at 195:15–16, 154:22–23.

Officer McGrenera confirmed that he was carrying a metal weapon at the time of Plaintiff's arrest—a retractable baton, called an "asp." (McGrenera Dep. 20:18–20.) McGrenera also indicated that he and Officer Burns were the only officers present in the bedroom at the time of Plaintiff's arrest.[4] Id. at 47:22. Notably, Officer Burns—the only officer other than McGrenera that was indisputably in the bedroom at the time the asp was allegedly used—testified that he was not carrying an asp at the time of Plaintiff's arrest. (Burns Dep. 13:9–11.) Finally, medical records noted the presence of a laceration and/or abrasion on the right side of Plaintiff's neck that could have resulted from a blunt force object.  (See Defs.' McGrenera & Hartnett Ex. N, P.)

---

[3] Additionally, eyewitness Steven Lucien stated that he entered the bedroom and saw Plaintiff get struck—while in handcuffs—with "one of  those … retractable type of nightsticks" by an East Lansdowne police officer "that was helping [to] detain Steven Rosembert." (Lucien Dep. 53:12–19.) Lucien estimated there were approximately four police officers in the bedroom. Id. at 53:2–7.

[4] McGrenera stated there was a bedroom struggle just prior to the initial deployment of the taser, where he only saw Officer Burns "to the front of [him]," physically assisting in the arrest. (McGrenera Dep. 24:10–14.) Burns also stated that he did not recall any other officers besides himself and McGrenera being in the bedroom as they tried to open the closet door to apprehend Plaintiff.  (Burns Dep. 14:10–15.)

A reasonable jury analyzing the above facts could find that Officer McGrenera was the only officer in the bedroom carrying an asp at the time of the first taser deployment, and that McGrenera used that asp to strike Plaintiff's neck. Thus, there is clearly a genuine dispute of material fact as to whether McGrenera struck Plaintiff with his asp at the time of the initial firing of the taser,[5] and whether this conduct was necessary to effectuate Plaintiff's arrest, or, constituted an unreasonable use of force.

Defendant Burns admits to having tased Plaintiff inside of the bedroom to effectuate Plaintiff's arrest. (Burns Dep. 20:2.) Officer Burns states, however, that he deployed his taser after Plaintiff raised his hands "in an aggressive posture" and would not remove himself from the bedroom closet. Id. at 20:12.  Burns admits that Plaintiff had not struck him or rushed toward him at the time the taser was deployed. Id. at 28:8–12. These facts, admitted by Burns, are sufficient to identify him as an officer that used force during Plaintiff's arrest.

Numerous other facts from the record demonstrate a genuine dispute of material fact regarding whether Burns' use of the taser amounts to excessive force. Plaintiff asserts that when he was discovered in the bedroom closet just before the taser was initially deployed, he "put his hands up," did not attempt to close the closet door, and did not attempt to run past the officers or otherwise escape the bedroom. (Pl.'s Dep. 94:13–14.) Further, a physician at Delaware County Memorial Facility removed a partially embedded taser barb from Plaintiff's abdominal region—confirming that the taser made direct contact with Plaintiff's body.  (See Del. Cnty. Mem. Hosp. Records, Defs.' Ex. N.) Medical records also confirm that an additional taser barb was found in the zipper of Plaintiff's jeans.[6] Id.

---

[5] McGrenera denies using his asp inside of the house during Plaintiff's arrest. (McGrenera Dep. 33:5–8.)

[6] Burns admits that subsequent to the taser deployment and arrest he was aware that one of the taser prongs struck Plaintiff's groin area. (Burns Dep. 24:2.)

Given the wide disparity between the parties' recollections of the moments just prior to the initial deployment of the taser, there is a genuine issue of material fact in dispute as to whether Burns' use of the taser was reasonable.

### 2. Excessive Force Based on Officers' Failure to Intervene

Plaintiff has not identified officers Selimis, Albertoli, and Hartnett as having physically struck him, nor does anything in the record identify these specific officers as having beaten, kicked, tased, or used a baton on Plaintiff during the course of his arrest. Nevertheless, Plaintiff argues that these officers are liable for excessive force, and predicates his argument on a "failure to intervene" theory.[7]  (See Pl.'s Resp., pp. 17–18, 20.)

Plaintiff cites to Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002) in support of his failure to intervene theory of excessive force against the remaining named officers. Smith held that a correctional officer who fails to intervene to prevent fellow officers from beating a prisoner may be held liable under § 1983 and the Eighth Amendment. Id. at 650. Though Smith established a correctional officer's duty to intervene in the context of an Eighth Amendment cruel and unusual punishment claim, the failure to intervene theory has also been applied to § 1983 excessive force claims against police officers under the Fourth and Fourteenth Amendments. See, e.g., Mensinger, 293 F.3d at 650–51 (citing Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)); Putnam v. Gerloff, 639 F.2d 415, 423 (8th Cir. 1981); Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972).

To establish a failure to intervene claim of excessive force, Plaintiff must show that the officer(s) "had reason to know that excessive force was being used . . . and that [the] officer[(s)]

---

[7] Plaintiff fails to specifically address whether Officer Albertoli failed to intervene in preventing the alleged excessive use of force violations by Officers Burns and McGrenera.  However, Officer Albertoli's sworn affidavit submitted to this Court confirms that he was at the scene of the arrest.  Accordingly, I will include officer Albertoli in this portion of my analysis.

had a realistic opportunity to intervene and prevent the harm from occurring." Jackson v. Mills, WL 57095, at *5 (E.D. Pa. Sept. 4, 1997) (emphasis in original); see also Lora-Pena v. Denney, 760 F. Supp. 2d 458, 468 (D. Del. 2011). Subordinate status does not relieve an officer from taking "reasonable steps to protect a victim from another officer's use of excessive force, even if that excessive force is employed by a superior." Mensinger, 293 F.3d at 650.

a.   Officer Selimis

Officer Selimis admits that she was on site during Plaintiff's arrest on May 24, 2011. (See Defs.' Selimis & Albertoli Br., p. 4; Selimis Aff., Defs.' Ex. E.) Selimis submitted a sworn affidavit describing her role in the arrest, which includes the following statement:

> The Plaintiff, Steven Rosembert ("Plaintiff"), was in handcuffs when I first observed him on May 24, 2011. I did not witness the physical apprehension of Plaintiff on May 24, 2011. I did not participate in the physical apprehension of Plaintiff on May 24, 2011. I had no physical contact whatsoever with Plaintiff on May 24, 2011.

(Selimis Aff. ¶ 5, Defs.' Ex. E.) Selimis' affidavit further states that "My involvement . . . was limited to escorting East Lansdowne Police Officer, Paul McGrenera, to the Delaware County Memorial Hospital, where I witnessed Officer McGrenera read Plaintiff his implied consent warning." Id. at ¶ 6.

Plaintiff has pointed to testimony that, when viewed in the light most favorable to Plaintiff, contradicts Selimis' affidavit. Witness Jean Rosembert testified that when he arrived on scene, a white female officer representing Lansdowne borough came out from inside the Lucien residence where his son was located. (J. Rosembert Dep. 65:24.) Jean Rosembert explained that he only saw one female officer that night.[8]   Id. at 66:7–10. Further, Plaintiff stated in his

---

[8] Additional statements in Jean Rosembert's deposition indicate that there may have been two female officers employed by Lansdowne Borough at the time of Plaintiff's arrest, a white officer and an African-American officer. Id. at 66:4–6.  Defendants have not disputed that Officer Selimis is Caucasian.

deposition that he saw a white female officer enter the room with several other officers "almost instantly" after he was initially tased in the bedroom. (Pl.'s Dep. 97:2, 14–20.)

Moreover, several of the civilian witnesses attest that Plaintiff was beaten and tased while he was being escorted in handcuffs to the patrol car, after the incidents in the bedroom had concluded. (Lucien Dep. 35:10–11; J. Rosembert Dep. 70:11–17; 71:10–15; 78:21–24.) Regarding the alleged beatings outside of the residence, Steven Lucien testified that he did not hear any of the officers who were present give a command to stop tasing the Plaintiff as he was being placed in the patrol car. (Lucien Dep. 65:20–23.)

Plaintiff has presented evidence that, if accepted, could establish that the beatings and additional tasings occurred after the initial tasing in the bedroom, while he was being taken to the police car, and inside of the patrol car.  Acceptance of these facts could allow a reasonable jury to find that Lansdowne Officer Tina Selimis, the only white, female officer that responded on the night of Plaintiff's arrest, witnessed the initial tasing and the alleged use of the asp in the bedroom, as well as the alleged continued beatings as Plaintiff was being taken to the police car. Thus, genuine issues of material fact remain as to whether Officer Selimis witnessed the alleged excessive force violations, and, whether she had a reasonable opportunity to prevent those violations.

b.  Officer Albertoli

Defendant Albertoli has submitted an affidavit nearly identical to that of Defendant Selimis. Albertoli admits in his affidavit that he was present at the site of Plaintiff's arrest, and first observed Plaintiff while already handcuffed. (Albertoli Aff. ¶ 5, Defs' Ex. F.)  Nevertheless, Defendants argue that Albertoli's mere presence at the scene is insufficient to defeat summary judgment.

Defendants cite to <u>Suber v. Peterson</u>, WL 1875542 (E.D. Pa. Aug. 4, 2005), where the district court granted summary judgment on a failure to intervene claim, despite the plaintiff placing the observing officer at the scene of her arrest. However, in <u>Suber</u>, all testimony presented, including that of the plaintiff, indicated that one of the officers did not reach the scene until after the alleged excessive force had ceased. <u>Id.</u> at *4 ("Under either party's version of the events, then, there is no evidence to support the plaintiff's claim that Officer Troili witnessed Officer Peterson" use excessive force). Here, Defendants argue that because Plaintiff has failed to point to any evidence establishing that Albertoli was present during the alleged excessive force, and Plaintiff failed to depose Albertoli, he should be dismissed.

I find Albertoli's role in this matter to be distinguishable from the facts presented in <u>Suber</u>. Albertoli's own affidavit places him at the scene of Plaintiff's arrest. Though Albertoli's affidavit states he did not observe Plaintiff until he was already in handcuffs, a genuine dispute of material fact remains as to whether Plaintiff was subjected to excessive force after being handcuffed and taken outside to the police car. Therefore, a fact finder could conclude that Albertoli was present while excessive force was being used, and that he should have intervened.[9] The fact that Plaintiff failed to depose Albertoli to obtain further information regarding his identity and actions is not dispositive. For these reasons, summary judgment will be denied as to Officer Albertoli.

---

[9] Moreover, the statement that Albertoli "did not participate in the physical apprehension of Plaintiff" only addresses whether he played a physical role in gaining control of, and placing the Plaintiff in handcuffs. (Albertoli Aff., Defs.' Ex. F.) That statement does not absolve Albertoli from failing to intervene to stop the alleged abuse that occurred outside of the residence.

c.  Officer Hartnett

At deposition, Defendant Hartnett stated that he arrived at the scene of the arrest in response to a request from Officer McGrenera to "watch a motorcycle."[10] (Hartnett Dep. 7:6–19.)  Hartnett further testified that when he arrived at the scene, Plaintiff was "in the back of a police vehicle." Id. at 8:14.  Hartnett recalled about ten civilians in the vicinity of the police car, along with several officers from Lansdowne and Yeadon boroughs that he could not identify by name. Id. at 8:20. Hartnett could not recall whether Plaintiff was screaming or yelling while in the back of the patrol car.  Id. at 10:6.  Hartnett did remember that the patrol car was "just about in transport" when he arrived. Id. at 10:15–16.

As noted above, other deposition testimony, viewed in the light most favorable to Plaintiff, could establish that Plaintiff was beaten and tased while inside the patrol car and in handcuffs. Guy Mystil testified that two additional tasings occurred after Plaintiff was seated inside of the patrol car, in handcuffs, and the door of the car was closed. (See Mystil Dep. 35:11–12, 23–24; 36:15–21) ("[H]e was taken to the back of a vehicle, the door was shut. . . . In the midst of that, Steven Rosembert was still yelling that the cuffs were too tight. And then he got tased . . . About maybe ten, fifteen seconds later, he was tased again. So I heard the taser go off twice.").  Defendant Hartnett admits he was present at the site of Plaintiff's arrest, stating that he arrived after Plaintiff was already seated in the patrol car. Mystil attests that two additional tasings occurred inside of the closed patrol car, both in response to Plaintiff yelling that his handcuffs were too tight. Mystil claimed that "shortly" after these two tasings, Plaintiff was "taken away."  (Mystil Dep. 36:22–23.)

---

[10] Conversely, McGrenera states that he did not call Hartnett for assistance on the evening of Plaintiff's arrest, and that the first time he saw Hartnett was at the East Lansdowne police headquarters after Plaintiff's arrest. (McGrenera Dep. 31:2–8.)

Accordingly, I also find the record as to Hartnett distinguishable from the facts at issue in Suber. By all accounts in Suber, one of the officers did not arrive at the scene until after the alleged excessive force. WL 1875542, at *4. Here, Guy Mystil testified that he observed Plaintiff being tased in the presence of bystanding officers, while Plaintiff was handcuffed, and seated in the back of the patrol car. By his own admission, Hartnett arrived in time to see Plaintiff in the back of the patrol car, just before transport. Thus, questions of material fact remain as to whether Officer Hartnett witnessed Plaintiff being tased inside of the police car, and whether he had a reasonable opportunity to prevent those harms from occurring. Accordingly, summary judgment will be denied as to Officer Hartnett.

### 3.  Defendant Boroughs - Monell Claims of Excessive Force

Plaintiff's § 1983 excessive force claims against the Defendant Boroughs are predicated on municipal liability under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978).  As a general rule, a municipality may be held liable for its employee's violation of a citizen's constitutional rights under § 1983, although not on a respondeat superior theory of liability. Id. at 690–92. To prevail on a Monell claim, a plaintiff must show a policy[11] or custom[12] created by a policymaker that sanctioned the alleged constitutional violation.  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583–84 (3d Cir. 2003) (citing Bd. of the Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997)).

---

[11] A "[p]olicy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).

[12] "'A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but is 'so widespread as to have the force of law.'" Natale, 318 F.3d at 584 (quoting Bd. of the Cnty. Comm'rs of Bryan Cnty., Okl., 520 U.S. at 417).

A municipality may be held liable under Monell when (1) the "appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of the policy;" (2) "where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself;" and (3) "where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice is so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Natale, 318 F.3d at 584 (quoting Bd. of the Cnty. Comm'rs of Bryan Cnty., Okl., 520 U.S. at 417–18). Thus, to survive summary judgment, Plaintiff must establish that the Defendant Boroughs either issued police department policies sanctioning the excessive use of force by borough law enforcement, or otherwise show that excessive force violations by borough police officers are so ubiquitous that they "have the force of law." Natale, 318 F.3d at 584.

Plaintiff has not met this burden. The record before me reflects that Yeadon and East Lansdowne police departments had written policies in place authorizing the use of necessary force to effectuate an arrest. (Defs.' Ex. H § II; Defs.' Ex. R, p. 38.)  Both department policies limit the use of batons and tasers to violent offenders.[13]  Moreover, the East Lansdowne and Yeadon excessive force policies only authorize police officers that are trained and certified in the use of the taser to carry and use department-issued tasers in the line of duty.  (Defs.' Ex. H § IV; Defs.' Ex. R, pp. 41, 46.)  Finally, both department policies require that any police officer that deploys a taser or uses a baton to file a use of force report, which is then reviewed by a

---

[13] East Lansdowne's excessive force policy includes sections that restrict the use of tasers and batons to dangerous or violent individuals. (See Defs.' Ex. H §§ IV, VII.)  Similarly, Yeadon Borough's excessive force policy includes a section that regulates the use of "electronic control weapons" when it is necessary to subdue "violent or potentially violent individuals." (See Defs.' Ex. R, p. 47.)

supervisor and the chief of police.  (Defs.' Ex. H § XIII; Defs.' Ex. R, pp. 48–49.)  Thus, Yeadon

and East Lansdowne boroughs have comprehensive excessive force policies that (1) require only

necessary force to be used during an arrest; (2) require prior training and certification for the use

of tasers; (3) restrict the use of tasers and batons to violent offenders; and (4) require supervisory

review of all uses of a baton or taser. Plaintiff has failed to identify any language from these

policies that authorizes the use of excessive force by police officers. Accordingly, the undisputed

record reflects that there is no written policy authorizing the excessive use of force for the

Defendant boroughs.[14]

Similarly, the record does not reveal any borough customs that authorize the use of

excessive force by police officers. Plaintiff only points to a single, unconfirmed instance of

excessive force he observed in high school that involved the arrest of a school mate named

"Greg" by a Lansdowne police officer. (Pl.'s Dep. 124:11–17.) This is far short of the well-

settled pattern of excessive force by police that Plaintiff must demonstrate in order to establish a

custom. Witnesses Steven Lucien, Guy Mystil, Jean Lucien, and Jean Rosembert all attest that

they were not previously arrested by Lansdowne police officers and were never subjected to use

of force or other abuse from Lansdowne officers.[15] (Lucien Dep. 12:12–14; Mystil Dep. 13:17–

19; Jean Lucien Dep. 12–13; J. Rosembert Dep. 22:23–24; 23:1–2.) Witness Jean Lucien stated

that he was not told of any abuses by Lansdowne officers by his close friends. (Jean Lucien Dep.

13:1–2.) Though Plaintiff's father, Jean Rosembert, mentions several unreported incidents of

racist remarks and crude language from Lansdowne officers, he does not identify any confirmed

---

[14] It is unclear why the excessive force policy of Lansdowne was not requested by the Plaintiff during discovery.  Because the Plaintiff has failed to present that policy, he has not met his burden to show that the Lansdowne policy authorizes excessive force.

[15] At deposition, counsel did not inquire about any prior arrests, incidents of abuse, or uses of force by officers from Yeadon or East Lansdowne police departments.

incidents of excessive force by officers of the Lansdowne police department, or the departments of the other boroughs named in this suit. (J. Rosembert Dep. 23:6–9; 31–35, 55:9–11.)

Plaintiff points out that Yeadon Police Department fails to keep accurate taser records, and thus the Department has a custom of unauthorized taser use by police officers. A custom can be shown "by evidence that a particular practice, although not authorized by law, is so permanent and well-settled that it constitutes law."  Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). While the Yeadon Police Department taser records fail to show that a taser was used on May 11, 2014 (the date of Plaintiff's arrest), the records do list nearly twenty additional entries from 2011 to 2014 showing taser deployments by Yeadon officers. (See Pl.'s Ex. H.) Without evidence that additional taser deployments were omitted from the record, Plaintiff's argument that there is a well-settled, permanent custom of keeping inaccurate taser records is not enough to overcome summary judgment. Schaar, 732 F. Supp. 2d at 493 (citing Williams, 891 F.2d at 460). Because Plaintiff has failed to show that a genuine dispute of material fact exists regarding whether the Defendant boroughs have a policy or custom that sanction excessive force by their police officers, summary judgment will be granted for the Defendant Boroughs on Count I.

### B.    Count III: Failure to Train, Supervise, and Discipline (Defendant Boroughs)

For reasons similar to those addressing the Monell excessive force claims, summary judgment will also be granted for the Defendant Boroughs on Plaintiff's Monell claims for failure to train, supervise, and discipline their respective police officers.

"[A] municipality's failure to train police officers only gives rise to a constitutional violation when that failure amounts to deliberate indifference to the rights of persons with whom the police come into contact." Montgomery v. De Simone, 159 F.3d 120, 126-27 (3d Cir. 1997) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)). "[T]he identified deficiency in

a city's training program must be closely related to the ultimate injury; or in other words, the deficiency in training [must have] actually caused the constitutional violation." Thomas v. Cumberland Cnty, 749 F.3d 217, 222 (3d Cir. 2014) (quoting Canton, 489 U.S. at 391) (quotation marks omitted).

Ordinarily, in order to establish that a failure to train constitutes deliberate indifference, a plaintiff must demonstrate a pattern of similar constitutional violations by untrained employees that shows the municipality was on notice of a deficiency in its training programs. Id. at 223 (quoting Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011)). However, a single incident may establish failure-to-train liability where "the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." Id. (quoting Canton, 489 U.S. at 390 n.10) (quotation marks omitted).

To allege a failure to supervise claim under Monell, the Third Circuit has required a plaintiff to show that the municipality has "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998) (citing Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997).

At the outset, I note that Plaintiff failed to request the Lansdowne Police Department's police manual to determine that department's training policies on the use of force. Defendants also point out that Plaintiff failed to depose any policymaker or supervisory officer to determine if there is a governing policy or custom that amounts to a failure to train or discipline that allows Lansdowne officers to engage in excessive force. (Defs.' Selimis, Albertoli & Lansdowne Br., p. 7.) Thus, after carefully reviewing the record, I agree that Plaintiff has failed to present any

evidence of a Lansdowne custom of failing to train or discipline police officers regarding the proper use of force. Plaintiff has similarly failed to present any evidence that Lansdowne had knowledge of similar incidents in the past that would demonstrate deliberate indifference to citizens' constitutional rights. Accordingly, summary judgment will be granted as to Plaintiff's failure to train <u>Monell</u> claim against Defendant Lansdowne Borough on Count III.

Plaintiff has also failed to point to evidence that could establish that East Lansdowne or Yeadon boroughs had knowledge of excessive force violations by the Boroughs' respective officers that would require the municipality to provide additional officer training. Plaintiff has not identified any deficiency in the Defendant Boroughs' training programs that can fairly be said to have caused the use of excessive force. Defendants have provided certifications from Delaware County Community College showing that officers McGrenera and Hartnett fulfilled all prescribed police courses required under Pennsylvania Law and approved by the Pennsylvania Municipal Police Officers Education and Training Commission ("MPOETC"). (Defs.' McGrenera & Hartnett's Br., Ex. F, G.) At deposition, Defendant Burns testified that he obtained annual certifications to serve as a municipal police officer through the MPOETC, and he noted that the annual certification is a requirement of all Yeadon police officers—a statement Plaintiff has not refuted with any evidence. (Burns Dep. 39:2–8.) Burns also represented that he was trained in the use of a taser and completed a training course to be certified. <u>Id.</u> Plaintiff's counsel failed to question McGrenera to determine if he was trained to use his expandable baton.

The policy manuals for Yeadon and East Lansdowne boroughs specify that the use of tasers is only approved for officers who have completed the proper training regimens. (Defs.' Yeadon Borough and Burns Ex. R, at "Level 3: Use of Electronic Control Weapons – (ECW's)"; Defs.' McGrenera Hartnett and Borough of E. Lansdowne, Ex. H, § IV. A.)  Regarding the use

of an "asp," East Lansdowne policy manual specifies that an "expandable baton" is authorized "when used by properly trained and certified police officers." (Defs.' McGrenera & Hartnett's Br., Ex. H, § VII.)  The policy goes on to describe certain procedures for the deployment of the baton, including a prohibition on raising the baton above the head to deliver a blow, and a preference for "short and snappy" blows that should be "directed towards the arms and legs" to incapacitate the aggressor, but to avoid serious injury. Id.

In light of the preceding facts, Yeadon and East Lansdowne boroughs have provided comprehensive training policies for the use of force by police officers, and have produced certifications for several of the officers implicated in this case.  Plaintiff has failed to rebut any of this evidence. Moreover, there is no evidence in the record to suggest that any of the Defendant Boroughs were aware of prior incidents of excessive force, that the training programs are deficient, or that any message approving the use of excessive force was conveyed by a supervisor.  Therefore, the Defendant Boroughs' motions for summary judgment will be granted as to Count III.

### C.  Count V: Assault and Battery (Defendants McGrenera and Burns)

Plaintiff has presented sufficient evidence to survive summary judgment to support his assault and battery claims against Officers McGrenera and Burns in their individual capacities. Under Pennsylvania law:

> [a]ssault is an intentional attempt by force to do injury to the person of another and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person. A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty.

Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).

Plaintiff's assault and battery claims against McGrenera and Burns stem from the same alleged use of force discussed in my previous analysis of Count I. As noted, genuine disputes of material fact remain as to whether McGrenera struck Plaintiff in the neck with his asp at the time of the initial deployment of the taser, and if so, whether the alleged beating was necessary to effectuate Plaintiff's arrest. Similarly, there is a genuine dispute of material fact regarding whether Burns' initial deployment of the taser inside the residence was a necessary use of force, particularly in light of Plaintiff's assertions that he put his hands up to surrender just before he was struck by the taser. The testimony of Plaintiff and several eye witnesses indicating that Plaintiff was tased numerous times as he was being taken out of the house and placed in the police car raise a genuine dispute of material fact as to whether Burns used reasonable force. Thus, Defendants' motion for summary judgment on Count V will be denied.

**D.  Count VII: Intentional Infliction of Emotional Distress (All Defendants)**

Under Pennsylvania law, a claim for intentional infliction of emotional distress requires that a plaintiff establish: (1) that he was subjected to extreme and outrageous conduct; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress was severe. Robinson v. May Dep't Stores Co., 246 F. Supp. 2d 440, 444 (E.D. Pa. February 12, 2003). "[E]xistence of the alleged emotional distress must be supported by competent medical evidence." Kazatsky v. King David Mem. Park, Inc., 527 A.2d 988, 995 (Pa. 1987). The competent medical evidence must provide "some objective proof" that the plaintiff actually suffered severe emotional distress from the defendant's actions. Id.; see also Cooper v. City of Chester, WL 925067, at *4 (E.D. Pa. Mar. 11, 2013) (finding that competent medical evidence of the alleged mental injury was required to sustain an intentional infliction of emotional distress claim where plaintiff was allegedly shot in the back).

Plaintiff has not produced any objective medical evidence to confirm his claim of emotional distress. Plaintiff did not seek a psychiatric evaluation, psychological care, or counseling. Though Plaintiff has produced medical evidence of physical injuries that he avers occurred from excessive force violations by officers McGrenera, Burns, and others, he has failed to verify his alleged <u>emotional</u> <u>injuries</u> through statements from a mental health specialist, or any other type of similar evidence.

At deposition, Plaintiff merely reiterated allegations from his complaint—that his injuries from the alleged beatings have caused him to have nightmares, flashbacks, and to fear police officers. (Pl.'s Dep. 23–25; <u>see</u> <u>also</u> Am. Compl. ¶ 111 (stating Plaintiff's psychological injuries have "manifested themselves physically in the form . . . sleep deprivation, reoccurring nightmares and other physically disabling manifestations")). Plaintiff has not substantiated his allegations of emotional distress with objective medical evidence. Therefore, Defendants' motions for summary judgment will be granted as to Plaintiff's intentional infliction of emotional distress claim.

## E.  <u>Qualified Immunity</u>

Defendants argue that, notwithstanding my determination that a reasonable jury could conclude that Plaintiff was a victim of excessive force under § 1983, I may still rule in their favor on qualified immunity grounds. Government officials are granted qualified immunity in § 1983 actions when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235, 1244 (2012) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in

light of the legal rules that were 'clearly established' at the time it was taken." Id. at 1245 (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).

A court must engage in a two-part inquiry to determine if qualified immunity applies to official actions: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly' established at the time of defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). In determining whether a defendant's conduct violated a clearly established right, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Assaf v. Fields, 178 F.3d 170, 177 (3d Cir. 1999).

As explored above, Plaintiff has alleged numerous facts that, if proven true, constitute a violation of his Fourth Amendment right to be free from the excessive use of force by law enforcement against the Defendant officers. Therefore, Plaintiff has shown a potential violation of a constitutional right and established the first prong of the qualified immunity inquiry.

Further, the Fourth Amendment right to be free from excessive force was clearly established at the time of the alleged misconduct in this dispute. See Graham 490 U.S. at 397; Johnstone, 107 F.3d at 204; Mellott, 161 F.3d at 121. Additionally, the Third Circuit first held that a failure to intervene and prevent a fellow officer from using excessive force could establish liability in 2002—several years before these incidents took place. See Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002). Therefore, Defendants knew or should have known that in effectuating Plaintiff's arrest they were required to use objectively reasonable force and/or intervene to prevent excessive force being used in their presence. As such, summary judgment is not appropriate on qualified immunity grounds.

**IV.**     <u>**CONCLUSION**</u>

Plaintiff has provided sufficient evidence to survive summary judgment with regard to his claims of excessive force against each of the named Defendant police officers under Count I, and his claims for assault and battery against Officers McGrenera and Burns under Count V. However, no reasonable jury could find <u>Monell</u> liability against the Defendant Boroughs under Counts I and III, nor could a competent jury find that any Defendant intentionally caused Plaintiff severe emotional distress under Count VII. Therefore, summary judgment is appropriate with respect to these claims.

An appropriate order follows.